No. 44,799

Felix A. Evangelist, *Appellant,* v. Bellern Research Corporation, a Corporation; Brockway Glass Co., a Corporation; Owens-Illinois Glass Company, a Corporation; Conway Springs Bottling Company, a Corporation, and Pepsi-Cola Bottling Company of Wichita, a Corporation, *Appellees.*

(433 P. 2d 380)

Opinion filed November 13, 1967.

*Gerald L. Michaud,* of Wichita, argued the cause, and *Russell Cranmer, Orval L. Fisher, M. William Syrios,* and *Kenneth L. Ingham,* of Wichita, were with him on the brief for the appellant.

*Donald R. Newkirk,* of Wichita, argued the cause, and *Wayne Coulson, Paul R. Kitch, Dale M. Stucky, Gerrit H. Wormhoudt, Philip Kassebaum, John E. Rees, Robert T. Cornwell, Williard B. Thompson, David W. Buxton, John T. Conlee, John Prather, Richard I. Stephenson,* and *Douglas D. Johnson,* of Wichita, were with him on the brief for the appellee, Bellern Research Corporation.

*H. E. Jones,* of Wichita, argued the cause, and *A. W. Hershberger, Richard Jones, Wm. P. Thompson, Jerome E. Jones, Robert J. Roth, William R. Smith, Robert J. O'Connor,* and *Greer Gsell,* of Wichita, were with him on the brief for the appellee, Brockway Glass Co.

*Robert C. Foulston,* of Wichita, argued the cause, and *George B. Powers, John F. Eberhardt, Stuart R. Carter, Malcolm Miller, Robert N. Partridge, Robert M. Siefkin, Richard C. Harris, Gerald Sawatzky, Donald L. Cordes, Robert L. Howard, Charles J. Woodin, Mikel L. Stout, Ronald K. Badger, Benjamin C. Langel, Phillip S. Frick, Jerry G. Elliott,* and *John E. Foulston,* of Wichita, were with him on the brief for the appellees, Conway Springs Bottling Company and Pepsi-Cola Bottling Company of Wichita.

The opinion of the court was delivered by

O'CONNOR, J.: This products liability action was instituted by the plaintiff, Felix A. Evangelist, to recover damages for personal injuries sustained when a partially filled Pepsi-Cola bottle broke as he was recapping it with a device known as a "Handy Dandy." Motions for a directed verdict on behalf of all the defendants were sustained at the close of plaintiff's evidence, and he has appealed.

The defendants are Bellern Research Corporation, the manufacturer of the "Handy Dandy"; Brockway Glass Co., the manufacturer of the bottle; Conway Springs Bottling Co. and Pepsi-Cola Bottling Company of Wichita, the bottler and distributor of the bottled beverage. For convenience, the defendants will be referred to herein as Bellern, Brockway, Conway, and Pepsi Bottling, respectively.

The question for determination is whether or not plaintiff made out a case against each of the defendants for breach of an implied warranty.

The accident occurred in the early morning hours of April 21, 1962, when Evangelist, a surgeon in the Air Force, upon returning to his residence following a late night hospital call, uncapped a twelve-ounce, disposable bottle of Pepsi-Cola with the "Handy Dandy," poured about half of the contents into a glass, and proceeded to recap the bottle. Gripping the bottle with his left hand, Evangelist took the "Handy Dandy," with the bottle cap in it, and placed it on the top of the bottle. He pushed until the cap partially

grasped the top of the bottle, then released a "red button" so that the "Handy Dandy" could be removed from the cap. Then, reversing the instrument in his right hand, and holding the bottle in the same way, he put the other end of the instrument down over the top of the bottle and, with his thumb on the top, pressed straight down. The bottle broke, and a long fragment of glass on the opposite side of the bottle entered the webbed space between the thumb and index finger of his left hand.

In describing the recapping process, Evangelist said he used the same procedure he had customarily followed on other occasions. He applied no more pressure than usual. He did not use a prying- or levering-type action, and attempted to get the "Handy Dandy" on straight. He had no intention of refilling the bottle, but was recapping it to retain the "fizz" in the contents remaining.

The bottle was from a six-pack carton purchased by plaintiff's wife at the McConnell Air Force Base commissary. The "Handy Dandy" had been given to the plaintiff as a Christmas present in 1958. He received it in a plain box, gift wrapped, and could not recall that any instructions or directions came with it. Since that time plaintiff and his wife had used the device on numerous occasions to open and recap soft-drink bottles.

At oral argument plaintiff challenged the manner in which his theory of recovery was stated in the pretrial order. A brief review of the pleadings and order will focus the issue.

In his amended petition plaintiff alleged that Brockway, Conway and Pepsi Bottling, in manufacturing, handling, distributing and selling the bottle, impliedly warranted it was suitable for use as a container for Pepsi-Cola, safe for public use, and sold in such a manner as not to be inherently or imminently dangerous when being recapped by a purchaser from the public; that as a result of the breach of said warranty, the bottle broke and he was injured. In a second count plaintiff sought recovery on the theory of negligence under the doctrine of *res ipsa loquitur*. Prior to the final pretrial conference, however, plaintiff's attorney notified the court and all defense counsel by letter he intended to rely solely on implied warranty against all defendants, including Bellern. The pretrial conference order stated that "Plaintiff elected to proceed against all defendants on the theory of *implied warranty only in that the bottle was defectively manufactured* and that the recapping device was likewise defectively manufactured and designed." (Emphasis added.)

Plaintiff now claims this court should review the propriety of the trial court's ruling upon plaintiff's theory as stated in his amended petition—that Brockway, Conway and Pepsi Bottling were liable for breach of implied warranty "in the manufacturing, handling, distributing and selling" of the bottle of Pepsi-Cola—rather than the restrictive language of the pretrial order—"the bottle was defectively manufactured." We cannot agree.

The purpose and effect of a pretrial order is clearly defined by the statutory and decisional law of this state. As stated in *Brown v. Hardin,* 197 Kan. 517, 419 P. 2d 912:

"The pretrial conference provided for by K. S. A. 60-216 has become an important part of our procedural process designed, among other things, to acquaint each party in advance of trial with the respective factual contentions of the parties upon matters in dispute, thus reducing the opportunity for maneuver and surprise at the trial, and enabling all parties to prepare in advance for trial. . . . Orders entered at pretrial conference have the full force of other orders of court and they control the subsequent course of the action, unless modified at the trial to prevent manifest injustice (K. S. A. 60-216). . . ." (p. 519.)

A review of the record fails to disclose that any attempt was made by the plaintiff to have the pretrial order modified, or that he objected to it in any way during trial. Plaintiff presented his evidence, defendants cross-examined his witnesses, and the trial court ruled on the respective motions for directed verdict with the idea that plaintiff's theory of recovery was as stated in the pretrial order.

On review this court will affirm or reverse in accordance with the presence or lack of error shown by the record upon the theory adopted by the parties at trial. A litigant may not for the first time on appeal change the theory of his case from that on which it was presented to the trial court, nor may he present matters or issues which he did not bring to the attention of that court. (*In re Bowlus,* 197 Kan. 351, 416 P. 2d 711; *Green v. Kensinger,* 193 Kan. 33, 392 P. 2d 122; *Potwin State Bank v. Ward,* 183 Kan. 475, 327 P. 2d 1091, 80 A. L. R. 2d 166.) It follows that plaintiff is bound by the theory of recovery stated in the pretrial order, as more fully explained hereafter, and we will review the record in that light.

We first turn our attention to plaintiff's case against defendants Brockway, Conway and Pepsi Bottling for the allegedly defective bottle.

Plaintiff's theory of recovery against the defendants, as defined by the pretrial order, was that Brockway was liable for breach of im-

plied warranty in that the bottle was defectively manufactured, and that Conway and Pepsi Bottling were liable for breach of implied warranty in that they bottled and distributed a defectively *manufactured* bottle. The defendants concede that by reason of our decision in *Nichols v. Nold,* 174 Kan. 613, 258 P. 2d 317, 38 A. L. R. 2d 887, there exists an implied warranty in the manufacture, distribution and sale of a carbonated-beverage container, such as a Pepsi-Cola bottle. This view finds support in other jurisdictions where it has been held that there is an implied warranty that a beverage container is reasonably fit for the purpose for which it is intended (*e. g., Renninger v. Foremost Dairies, Inc.,* 171 So. 2d 602 [Fla.], and *Vassallo v. Sabatte Land Company,* 27 Cal. Rptr. 814 [both milk bottle cases]. Also, see cases collected in 2 Hursh American Law of Products Liability, §16:1, *et seq.* and Anno. 81 A. L. R. 2d 257 §10). The burden of proving a breach of implied warranty was on the plaintiff, and that burden was not sustained simply by showing the bottle broke and he was thereby injured. (*Patterson v. Weyer, Inc.,* 189 Kan. 501, 370 P. 2d 116; *Swengel v. F. & E. Wholesale Grocery Co.,* 147 Kan. 555, 77 P. 2d 930.) In other words, it was incumbent upon plaintiff to establish the bottle was defectively manufactured.

In reviewing the correctness of an order sustaining a motion for directed verdict, this court, like the trial court in considering the motion, must resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought; and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. (*McKinney v. Cochran,* 197 Kan. 524, 419 P. 2d 931.) If the evidence presented on an issue is undisputed and is such that reasonable minds could not accept it as sufficient to establish the existence of a fact, it becomes the duty of the court to take the issue from the jury. (*Toole v. Johnson,* 195 Kan. 88, 402 P. 2d 823.)

Keeping in mind the above-stated rules, let us examine plaintiff's evidence introduced to show the bottle was defectively manufactured. Except for one small piece of glass, the pieces of the broken bottle were saved and subsequently examined by three experts called as witnesses by the plaintiff. Two of them testified that in their opinion there were no defects in the bottle. The third witness was Dr. Oscar G. Fryer, a college physics teacher, who had done work as a consultant in physics and also conducted tests and re-

search on bottles for a soft drink company. He had examined the broken pieces and reconstructed the bottle in question, except for the one missing piece. In his opinion the origin of the break was in the "reinforcing crown" about one-half inch from the top of the bottle, but he was unable to examine that immediate area for defects because that was the part of the bottle that was missing. He found four points of imperfection in the bottle—two scratches near the bottom of the bottle, and two roughened "dimples" or "bubbles" near the top. In describing these points, Dr. Fryer testified:

"MR. MICHAUD: Describe the nature of those internal defects.

"A. Well, these two are just scratches, small scratches.

"Q. Did they materially weaken the bottle at those points?

"A. Yes, if you would hit them at that point on the opposite side.

"Q. Now, the two up at the top of the neck.

"A. The two at the top are a little different in nature. They are bubbles that are so near the inner surface that they broke out at the time of manufacture, and they became roughened. I don't know how. It wouldn't have happened in the manufacture. But due to the fact that they are roughened, they become the same hazard as you have in the other two because any time you roughen the inner surface of a bottle, break the smooth surface, you subject it to the same—the same hazard as you have the ones down here. That is, you hit them on the outside and it would weaken the bottle from a blow, not from the internal pressure, but from a blow; and all of these had about the same effect. They are all damaged because of the internal scratch or pit, a roughness.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. . . . Did you say in this bottle two seeds with rough edges were found near the nucleus of the break?

"A. Yes, within a half-inch.

"Q. And you have just pointed them out?

"A. Yes.

"Q. Therefore, this bottle was materially weakened from these pits on the inside surface?

"A. Yes.

"Q. What do you mean by that?

"A. I mean that if you hit the bottle exactly over that point, the blow that you'd strike it with would be much less than if the pits were not there. I'm not talking about the pits, I'm talking about the roughness there. The dimple doesn't matter. It doesn't matter if it's smooth dimples; that is, the falling in of these bubbles in the manufacture. They will be entirely smooth, and it wouldn't have any effect on the internal, but if it's roughened and I hit it directly over it and it's damaged to that extent. You hit a half-inch from it, you have nothing to do with it."

Dr. Fryer conducted tests on several other bottles of like nature furnished to him and, using the "Handy Dandy," was not able to

break any of them. It was his opinion that it would be impossible to break a sound bottle with the device, and that the bottle used by the plaintiff was not sound. The witness testified the four imperfections, including those bubbles with roughened edges, had nothing to do with the breaking of the bottle. He further testified:

"Q. Now, Doctor, I believe you mentioned . . . these roughened edges of the bubbles that you found there had nothing to do with the breaking of this bottle, but they would not have happened in the manufacturing process. Is that correct?

"A. Well, the bubbles were put in there in the manufacturing process.

"Q. The roughened edges?

"A. No, I don't think so.

"Q. *So then in manufacturing of them if they were smooth, there would be no problem.*

"A. *That's right.*

"Q. *And the roughened edges were not put there in the manufacturing process?*

"A. *Well, I don't think so. I don't know how it might be done.*

"Q. It is your opinion that it was not?

"A. I don't believe it was." (Emphasis added.)

In rendering his final opinion as to whether or not the bottle was defective and when the defect, if any, occurred, Dr. Fryer testified:

"A. If he [plaintiff] pressed down, and I'm not questioning that at all, if he pressed down, then the bottle in this area must have had a very severe damage before he did that. Now, as to who put the damage in there, I have not the slightest idea. But the damage must be so great, the bottle must be so near apart that by pushing down here, he can finish the break. He can't do it by a little scratch or a little pimple inside.

"Q. And you are saying that bottle was defective?

"A. Yes. But it's either or. If he did push down here, then it must have been a very hard damaged bottle. If it's not a damaged bottle, then he would have to push it down here. Now, you can have your choice.

"Q. In other words, one of two things in your opinion happened? *Either the bottle was grossly defective and damaged right there, or he put a levering action on it and it had minor damage?*

"A. *That's exactly right.*

"Q. And one of those two things is the opinion you're giving this Court and jury?

"A. These pairs have to go together.

"Q. And if it was grossly damaged and Dr. Evangelist and his wife who handled it did not drop it or bump it, then you can't tell the Court and jury where it happened?

"A. No, I can't. *I know it didn't happen in the plant. Because a crowner would have done the same thing. It happened after it left the plant.*

"Q. *It could have happened in handling after it left the crowner, could it?*

"A. *Yes.*

"Q. You don't know where it happened?

"A. I know where it didn't happen.

"Q. And it didn't happen when Dr. Evangelist had it, if he says him and his wife didn't bump it or drop it?

"A. I wouldn't go that far.

"Q. If you assume they didn't do that.

"A. I'm assuming they didn't. I don't know who did it. I don't know anything about the circumstances. *I know from a physical standpoint it could not have happened in the plant.* I don't know where after that it might have happened, a minute before, a hour before, or days before." (Emphasis added.)

From a careful review of Dr. Fryer's testimony it is apparent that the "bubbles" in and of themselves would not weaken the bottle unless in some manner the edges thereof became roughened, in which case the bottle would become materially weakened if it received a direct blow over the roughened "bubble." The most that can be said of his testimony is that in his opinion the bottle in question was not sound at the time plaintiff attempted to recap it, because *either* the bottle had been damaged by a blow directly over a "bubble" with roughened edges, and the application of pressure by the plaintiff with the "Handy Dandy" finished the break, *or* the bottle had a "bubble" with roughened edges, which in and of itself was a minor defect, and broke as a result of a levering-bending-type action being applied with the "Handy Dandy." Under either conclusion, as expressed by the witness, *the "bubble" must have had roughened edges in order to have constituted a defect, and in the opinion of the witness the edges could not have become roughened during the manufacturing or bottling processes.* As opined by the witness, if the bottle received a heavy blow directly over a "bubble" with roughened edges, thereby seriously weakening the bottle, it would have occurred after the capping process at the bottling plant, because otherwise the bottle would have broken from the pressure applied by the "crowner." This testimony effectively negatived plaintiff's theory of recovery against the defendants as defined by the pretrial order, namely, that the bottle was defectively manufactured. In fact, the testimony went so far as to rule out any possibility that a defect occurred in the manufacturing process.

Despite the effect of Dr. Fryer's testimony, plaintiff contends that once he showed the bottle was defective at the time it reached his hands, he had made out a case, and it then became incumbent upon the defendants to show where the defect occurred and who was responsible for it. In support of his argument plaintiff relies

on a statement from *Simmons v. Wichita Coca-Cola Bottling Co.,* 181 Kan. 35, 309 P. 2d 633, that inasmuch as there was no question of the Coca-Cola's being contaminated at the time it was sold and delivered to the plaintiff, the bottling company, to avoid liability under its warranty, must show who contaminated the beverage.

We think plaintiff's reliance on what was said in the *Simmons* case is entirely misplaced. Nothing said therein can be construed to mean that the burden is other than on a plaintiff to establish the breach of an implied warranty. There, the plaintiff had established the breach merely by showing the bottle contained a packet of safety matches, while in this case, as we have pointed out, plaintiff's evidence failed to establish a breach of the implied warranty relied on. The language in *Simmons* cannot be lifted from context but must be confined to the issue under consideration by the court—whether or not the defendant bottler of a beverage for immediate human consumption may show that if there was contamination it was caused by the action of a third party and thus relieve itself of liability.

Only recently we had occasion to point out that irrespective of the theory of recovery—negligence or implied warranty—a prerequisite to recovery against a manufacturer for a defective product is that the plaintiff must show the product was defective at the time it left the manufacturer's control. (*Jacobson v. Ford Motor Co.,* 199 Kan. 64, 427 P. 2d 621.) The rule is well stated in *Gardner v. Coca-Cola Bottling Co.,* 267 Minn. 505, 127 N. W. 2d 557:

"Before liability can result from a breach of an implied warranty there must be proof from which an inference is permissible that the product was defective. In Prosser, Torts (2 ed.) §84, p. 509, we find the following:

" '. . . The existence of the warranty of course does not eliminate the necessity of proof that the product was defective when it left the defendant's hands; . . .' " (p. 510)

Also, see Anno. 81 A. L. R. 2d 259. Thus, it may be said as a general rule that there must be evidence from which it may reasonably be inferred that the defect existed at the time the product left the possession or control of the party sought to be held liable.

From what has been said, it follows that plaintiff failed to prove the bottle was defectively manufactured. Hence, he did not make out a submissible case against the defendants Brockway, Conway and Pepsi Bottling on his theory that said defendants manufactured, distributed and sold a *defectively manufactured* bottle. Accordingly, the trial court properly sustained defendants' motions for directed verdict.

We now turn our attention to the liability of Bellern, the manufacturer of the "Handy Dandy." Plaintiff sought recovery against said defendant on the theory of breach of implied warranty in that the recapping device was defectively manufactured and designed. The record is barren of evidence showing the instrument was defectively manufactured, so we need only concern ourselves with defective design. It is not entirely clear on what basis the trial court sustained the motion for directed verdict on behalf of Bellern. Irrespective of that fact, we think the propriety of the ruling should be considered from the standpoint of whether or not as a matter of law plaintiff may predicate liability against the defendant for breach of an implied warranty of manufacturer-design.

Plaintiff has cited us to no authority holding that there is an implied warranty against defective design on the part of a manufacturer of a simple household device such as the "Handy Dandy," and our limited research has revealed none. We gather from plaintiff's brief and argument he is asking us to recognize and apply an implied warranty to this device upon the same public policy considerations that were used in cases involving food, drink, beverage containers, hair preparations, and recently, animal vaccine. Conversely, defendant suggests that were we to extend an implied warranty against defective design to a product of this type, and thus further carve out an exception to the common-law rule of *caveat emptor*, it would virtually amount to the wholesale lifting of the privity requirement in this state on all products.

The status of our law on implied warranty was thoroughly explored in *Chandler v. Anchor Serum Co.*, 198 Kan. 571, 426 P. 2d 82, and the reader is directed to that opinion for a review of our decisions. The cases therein cited and discussed illustrate that where an implied warranty was found, it was imposed by operation of law on the basis of public policy, and consequently, privity of contract was not esssential for recovery against the manufacturer. These exceptions to the common-law rule have been born on a case-by-case basis as the need for protection to the consuming public demanded, and with each exception the privity requirement has fallen.

The nature of the product involved in each case has been, as it should be, of manifest importance in determining whether or not warranty protection should be extended as a matter of public policy. The lack of similarity of the "Handy Dandy" and the products in-

volved in those cases reviewed in *Chandler* is readily apparent. The product here is quite unlike an automobile tire which, from its very nature, could be imminently dangerous to life and limb if defectively designed. (See *B. F. Goodrich Company v. Hammond,* 269 F. 2d 501 [10th Cir. 1959].) We have here a product likely found in many households. Its only feature possessing any uniqueness is that it may be used to manually recap a beverage bottle. It is free from working parts, and simple in design. Inherently dangerous characteristics are lacking, and common sense dictates its limitations of use. That the device may become imminently dangerous if defectively designed, and thus bring about injury, is difficult to imagine, and at best, is a remote possibility. The same may be said of many common tools, such as a hammer, kitchen knife, or ice pick. The law, however, does not require that every product be accident-proof or totally incapable of doing harm. It would be unreasonable, in our opinion, to hold the manufacturer of this simple household device responsible for every injury which might ensue from mishap in its use on the ground that it could have been designed safer or completely accident-free.

We note that nearly all the cases from other jurisdictions which have dealt with the manufacturer's duty of design have predicated liability on the ground of negligence rather than implied warranty. (Anno. 76 A. L. R. 2d 91, *et seq.;* 3 Hursh, American Law of Products Liability §20:1, *et seq.*) The courts are nearly unanimous in saying the product-design duty of a manufacturer is that of reasonable care, but he is not an insurer that his product, from a design standpoint, be accident-proof or incapable of producing injury.

Bearing in mind that recovery is sought here on the theory of implied warranty of design rather than negligence, we refuse to extend the warranty to a simple household device such as the "Handy Dandy." We therefore hold that as a matter of law plaintiff cannot recover against the defendant manufacturer. Thus, it is unnecessary to examine the sufficiency of plaintiff's evidence against Bellern.

We hasten to add that the full impact of the new Uniform Commercial Code, adopted in this state since the time plaintiff's cause of action accrued, is yet to be considered in the area of products liability in relation to implied warranties. We need not cross that bridge in this opinion.

The judgment of the district court is affirmed.