No. 47,850

Bernard Brooks, *Plaintiff-Appellee,* v. Donald Dietz and Connie Dietz, *Defendants,* and Bryant Air-Conditioning Co., Inc., *Defendant-Appellant.*

(545 P. 2d 1104)

Opinion filed January 24, 1976.

*Donald R. Newkirk*, of Fleeson, Gooing, Coulson and Kitch, of Wichita, argued the cause, and *J. Eric Engstrom*, of the same firm, was with him on the brief for the appellant.

*Raymond L. Dahlberg*, of Turner and Hensley, Chartered, of Great Bend, argued the cause, and *Lee Turner*, of the same firm, and *John V. Black*, of Pratt, were with him on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: This is a products liability case arising out of a propane gas explosion. Plaintiff, an experienced plumber and furnace repair man operating his own business, was injured by the explosion on February 9, 1970, while preparing to repair a home furnace he had sold and installed some seven years before. The defendant Bryant Air-Conditioning Co., Inc., manufactured the furnace. (The owners of the home, Mr. and Mrs. Donald Dietz, were originally parties defendant but plaintiff's claim against them was dismissed prior to trial. They counterclaimed for damages to their home, but have not appealed from an adverse verdict on their claim so they are not parties to this appeal.)

Plaintiff alleged that the exploding gas was permitted to escape and accumulate in the basement of the Dietz home by the malfunction of a relay switch which was designed to cut off the gas supply to the main burner and pilot light any time the pilot light went out. The malfunction, it was claimed, resulted from a design or manufacturing defect in the seal of the box containing the switch. It was plaintiff's theory that because the seal was imperfect, moisture and dirt could and did enter the box and corrode a metal shaft on which the switch turned. The resultant binding, he said, prevented the shaft from rotating and the switch from performing its intended function. This claim was submitted to the jury on theories of both negligence and strict liability, and resulted in a general plaintiff's verdict of $262,160.33. Defendant Bryant Air-Conditioning has appealed.

The first issue we must face on appeal is the propriety of the trial court's submission to the jury of the theory of strict liability. At trial Bryant specifically disclaimed any objection to the *form* of the court's instructions on this issue, but it advanced and renews here several reasons why the issue should not have been submitted at all.

First, it asserts that this court has never explicitly adopted the doctrine of strict liability as set out in the Restatement, Second, Torts, § 402A:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Bryant is correct in this assertion, but is also correct in the analysis in its brief here that "this Court has for years recognized something closely akin to strict liability in the food and body preparation cases where privity is not required, negligence need not be proved if the product was dangerous and defective and injury resulted therefrom. (*Swengel v. F. & E. Wholesale Grocery Co.*, 147

Kan. 555, 77 P. 2d 930; *Nichols v. Nold,* 174 Kan. 613, 258 P. 2d 317; *Graham v. Bottenfield's, Inc.,* 176 Kan. 68, 269 P. 2d 413.)"

In recent years we have gone beyond the "food and body preparation" cases and have held manufacturers and sellers strictly liable for other dangerously defective products. See, *e. g., Jacobson v. Ford Motor Co.,* 199 Kan. 64, 427 P. 2d 621 (1967) (defective brakes); *Evangelist v. Bellern Research Corporation,* 199 Kan. 638, 433 P. 2d 380 (1967) (bottle-recapping device); *Bereman v. Burdolski,* 204 Kan. 162, 460 P. 2d 567 (1969) (defective brakes); *Tilley v. International Harvester Co.,* 208 Kan. 75, 490 P. 2d 392 (1971) (broken wheel); and *Butterfield v. Pepsi-Cola Bottling Co.,* 210 Kan. 123, 499 P. 2d 539 (1972) (exploding bottle).

Liability in those cases was predicated on an implied warranty of fitness—a concept peculiar to the law of contracts. Yet no privity of contract was required between a manufacturer or seller and the damaged consumer, and the warranty in such a case is one which cannot be disclaimed. The anomaly of treating the resultant liability as a matter of contract was judicially recognized in the seminal case of *Greenman v. Yuba Power Products, Inc.,* 59 C. 2d 57, 27 Cal. Rptr. 697, 377 P. 2d 897 (1963). It was there recognized that liability for damages resulting from putting in commerce a dangerously defective product is not the result of contract but, like other tort liability, is imposed by public policy.

In that case the court took note of the nearly universal judicial trend of imposing strict liability first as to food products and later as to other products which might if defective create an unreasonable hazard. After reviewing cases from many jurisdictions the California court reasoned as follows:

"Although in these cases strict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, the abandonment of the requirement of a contract between them, the recognition that the liability is not assumed by agreement but imposed by law (see e. g., *Graham v. Bottenfield's, Inc.,* 176 Kan. 68 [269 P. 2d 413, 418]; *Rogers v. Toni Home Permanent Co.,* 167 Ohio St. 244 [147 N. E. 2d 612, 614, 75 A. L. R. 2d 103]; *Decker & Sons v. Capps,* 139 Tex. 609, 617 [164 S. W. 2d 828, 142 A. L. R. 1479]), and the refusal to permit the manufacturer to define the scope of its own responsibility for defective products (*Henningsen v. Bloomfield Motors, Inc.,* 32 N. J. 358 [161 A. 2d 69, 84-96, 75 A. L. R. 2d 1]; *General Motors Corp. v. Dodson,* 47 Tenn. App. 438 [338 S. W. 2d 655, 658-661]; *State Farm Mut. Auto Ins. Co. v. Anderson-Weber, Inc.,* 252 Iowa 1289 [110 N. W. 2d 449, 455-456]; *Pabon v. Hackensack Auto Sales, Inc.,* 63 N. J. Super. 476 [164 A. 2d 773, 778]; *Linn v. Radio Center Delicatessen,* 169 Misc. 879 [6 N. Y. S. 2d 110, 112]) make clear that the lia-

bility is not one governed by the law of contract warranties but by the law of strict liability in tort." (*Id.*, 59 C. 2d at 63.)

*Greenman v. Yuba Power Products, Inc.* spawned a vast progeny of cases throughout the country adopting strict liability—in tort—in defective products cases. See annotation, "Products Liability: Strict Liability In Tort," 13 A. L. R. 3d 1057, and 1975 Supplement thereto, indicating that at least 33 states have embraced the doctrine. The Restatement formulation of the rule appears to be that which is almost universally adopted.

This court, although not yet going so far, has through its decisions mentioned above given clear indications of the direction in which it has been heading. Our signposts were correctly read in *Symons v. Mueller Company*, 493 F. 2d 972 (10th Cir. 1974). That was a gas explosion case in which liability was based on an allegedly defective valve tee. Since it was a diversity case arising in this state the federal courts were obliged to apply Kansas law. The Tenth Circuit observed:

"The fact that the Supreme Court of Kansas has not designated this type of action strict liability but refers to it as breach of warranty does not, in our view, furnish a basis for a distinction. The Kansas court has thus treated warranty in the same manner as strict liability. It is, however, a tort since privity is held to be unnecessary.

"As was said by this court in B. F. Goodrich v. Hammond [269 F. 2d 501 (10th Cir. 1959)], the implied warranty is imposed by the law on the basis of public policy.

"From the evidences presented we are unable to conclude that Kansas would not follow the substance of § 402A, comment q, under these circumstances. Defendant-appellant cites no cases which would tend to indicate that Kansas does not recognize the doctrine of strict liability under circumstances similar to those at bar." (P. 977.)

We have concluded the time has come for this court to adopt the rule of strict liability as set out in § 402A of the Restatement, supra, and we therefore so hold. (See PIK, Civil, [1975 Supp.] 13.21, and the Committee's comment, where this action is anticipated.)

A second reason Bryant advances for not submitting strict liability is its assertion that an action on that theory was barred by the statute of limitations. The explosion occurred February 9, 1970; the petition filed in 1971 claimed only that the alleged defect was the result of negligence and constituted a breach of implied warranty. It was not until May, 1974, shortly before trial and more

than four years after the explosion, that the trial court first announced that plaintiff could rely on the theory of strict liability.

In permitting plaintiff's amendment (by way of the pre-trial order) to relate back to the original filing the trial court relied on *Crabb v. Swindler, Administratrix,* 184 Kan. 501, 337 P. 2d 986, where we said: "While good practices require the plaintiff's initial pleading to proceed on a single and definite theory, under modern code systems, the pleading may be held sufficient if it states a cause of action on any theory." (Syl. ¶ 1.) Since then we have expounded on the "relation back" problem at greater length in *James v. City of Wichita,* 202 Kan. 222, 226, 447 P. 2d 817:

"The present rules of practice in Kansas are patterned after the federal rules. The federal rules seek to make pleadings and amendments less technical in keeping with the idea that pleading a precise cause of action should not be the deciding factor. The deciding factor on relating an amendment back to the petition is whether the other party was actually notified of the litigation involving a described conduct, transaction or occurrence. (*Tiller v. Atlantic Coast Line,* 323 U. S. 574, 89 L. Ed. 465, 65 S. Ct. 421.)

"The notes of the advisory committee which drafted our present rules of practice read in part as follows:

" 'Section (c), dealing with relation back of amendments, is important only when the statute of limitations would bar a new suit. Here an amendment which changes the "cause of action," as that term has been commonly construed, is allowed if the amended claim arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading and thus defeat the bar of the statute of limitations.' (Gard, Kansas Civ. Proc. § 60-215 (c), p. 79.)

"Fowks, Harvey and Thomas in 2 Vernon's Kansas Statutes Annotated, § 215.4, p. 83 state:

" 'Subdivision (c) provides that an amendment may relate back to the date of the original pleading when the claim or defense, asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. This would appear to be a more liberal test than that existing under previous practice. Clearly, if no statute of limitations is involved, the court should freely permit amendment, even though a new claim is thereby introduced, if an expeditious disposition of controversies between the parties will thereby be furthered. (Citing cases.)

" 'If there is a statute of limitations question in the case, a pleading may not be considered as relating back where it is amended to state a new or different claim or defense unless such claim or defense arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. . . .' "

See also 6 Wright and Miller, § 1497:

". . . The fact that an amendment changes the legal theory on which the action initially was brought is of no consequence if the factual situation

upon which the action depends remains the same and has been brought to defendant's attention by the original pleading.

"Thus, an amendment may set forth a different statute as the basis of the claim, or change of a common law claim to a statutory claim or vice-versa, or shift from a contract theory to a tort theory, or delete a negligence count and add or substitute a claim based on warranty, or change an allegation of negligence in manufacture to continuing negligence in advertising." (Pp. 500-01.)

Here the factual basis of plaintiff's claim never changed; it was always bottomed on the claimed defect in Bryant's product. Under the authorities cited the pre-trial change in legal theories was clearly permissible. The amendment related back to the original filing, and was not barred by the statute of limitations.

Bryant also contends that the issue should not have been submitted because of deficiencies in plaintiff's evidence. On this score it first says there was no evidence that the relay switch was defective when it left Bryant's hands. Proof of a defect at that time was essential to plaintiff's case, and the jury was so instructed. Without detailing the evidence, it is sufficient to note that the testimony was in conflict as to whether a cork gasket was in place as it should have been, or whether an unsatisfactory sealing compound had been used. Comment $g$ to Restatement § 402A, after imposing on a plaintiff the burden of proving the existence of the defect at the time it left the hands of the defendant, goes on to say:

"Safe condition at the time of delivery by the seller will, however, include proper packaging, necessary sterilization, and other precautions required to permit the product to remain safe for a normal length of time when handled in a normal manner."

We think there was sufficient evidence from which the jury might reasonably have concluded that the absence of a proper seal here was the cause of the product's failure "to remain safe for a normal length of time when handled in a normal manner."

As a final argument against the submission of strict liability Bryant argues that the doctrine is only applicable where the damaged party is an unsuspecting user. Here, it asserts, "plaintiff had discovered the condition and was aware of the danger."

We think Bryant somewhat overstates its case on this point. That part of Comment $n$ to § 402A upon which it relies says:

". . . If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery."

The key thought here is that one knowing of the defect may not

"unreasonably" make use of the product. The portion of the Comment *n* just preceding that relied on by Bryant makes this clear:

"Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases . . . applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability."

See also annotation, "Products Liability: Contributory Negligence or Assumption of Risk as Defense under Doctrine of Strict Liability in Tort," 46 A. L. R. 3d 240.

It seems to us that whether plaintiff here was "unreasonable" in his "use of the product," *i. e.*, whether he "voluntarily and unreasonably proceed[ed] to encounter a known danger," was a matter of defense rather than an element of plaintiff's cause of action. In a negligence case if the plaintiff's contributory negligence is patent and incontrovertible the defendant may be entitled to a directed verdict, and in that sense it may be said that negligence should not be submitted to the jury. If, however, reasonable minds might differ as to the reasonableness of plaintiff's conduct, the defense of contributory negligence is submitted for determination by the jury along with the question of defendant's negligence where it is in issue. So here, the fact that plaintiff's voluntary exposure to the hazard *may* have been unreasonable would not justify taking the issue of strict liability from the jury unless reasonable minds could not differ in their assessment of his conduct. We think the evidence, to be discussed shortly, presented a jury question on the reasonableness of plaintiff's conduct.

We therefore hold that it was not error to submit the strict liability question to the jury for any of the reasons advanced by the defendant Bryant.

Bryant's final point on appeal is that plaintiff was guilty of contributory negligence (or assumption of risk) as a matter of law, so as to have entitled it to judgment notwithstanding the verdict on its posttrial motion. This contention is obviously closely related to its argument just discussed that plaintiff's admitted conduct precluded the submission of strict liability to the jury. It requires us to examine the circumstances surrounding the explosion itself.

The conduct of the participants on the day of the explosion is not in dispute. On that February day, at about 1:30 p. m., Mrs. Dietz noticed her house was getting cool, and when she turned the thermostat up the furnace did not go on. She smelled gas shortly after she turned up the thermostat. Mrs. Dietz had been instructed by her husband, who was not then at home, that if there was any trouble with the heating system she should call the plaintiff, Mr. Brooks. She called Mr. Brooks' place of business and talked to a secretary, but there was no repairman available at that time.

Later in the afternoon, the smell of propane got worse and Mrs. Dietz called back, reported that fact, and requested that a repairman be sent. Mr. Brooks appeared at the Dietz residence about 4:00 p. m. When he arrived he inquired if the propane tank had been filled that day, which might account for the smell; he was advised it had not. He went immediately to the basement where the furnace was located, accompanied by Mrs. Dietz and her small children. Brooks turned two valves at the furnace and instructed Mrs. Dietz that if she ever smelled gas again she should turn off the gas coming to the furnace by turning those two knobs.

Brooks smelled gas when he went into the basement, but couldn't determine the quantity. After he shut off the supply to the furnace he asked Mrs. Dietz about the hot water heater. She showed him where it was located in a corner of the basement with a door in front. It was a gas heater and it was burning.

He explained at trial that he did not shut off the hot water heater because he couldn't reach it without opening the door, and he thought that opening the door might increase the risk of an explosion. He knew that the water heater had a flame in it which was a possible source of ignition and could cause the propane to explode. At that time he told Mrs. Dietz and the children, "Let's get out of here."

They all went outside, where Brooks secured a trouble light and tools from his truck. He then returned to the basement, plugged in his trouble light, looked unsuccessfully for a main shut off valve, and checked for leaks in the inside pipes. He concluded that the relay switch was malfunctioning and had permitted gas to escape. He therefore knelt down in front of the furnace to read the serial number on the switch. He then intended to go outside, to shut off the main gas supply at the outside tank, to keep Mrs. Dietz and the children out of the house, and to air it out while he returned to

town and procured a replacement switch and an electrician. While he was kneeling in front of the furnace the explosion occurred. Although exact proof of the source of ignition was impossible, the most likely source was the hot water heater, as testified to by plaintiff's expert witness.

Bryant does not contend there was anything unreasonable about plaintiff's first trip to the basement to survey the situation. Its claim of negligence (or unreasonable exposure to a known danger) as a matter of law is based entirely on the second trip. In the light of all that he knew, Bryant urges, it was patently foolhardy for Brooks to re-enter the basement without at least turning off the main outside gas valve and thereby extinguishing the hot water heater flame.

The factors relied on by Bryant are these: Brooks had 25 years of experience as a plumber and had been installing gas furnaces for about 12 years. He was familiar with the explosive nature of gas and customarily advised a customer with gas in the house to ventilate it, yet in this instance he didn't open any windows. He knew the hot water heater was burning and posed an explosion danger, yet he didn't turn off the gas at the main outside valve on the tank which would have extinguished the burner flame. His awareness of the danger, says Bryant, is clearly demonstrated by his injunction to the Dietzes to "Let's get out of here."

Bryant characterizes plaintiff's testimony about his knowledge of conditions in the Dietz home as "admissions." It does so in an effort to bring into play the rule of *Hiniger v. Judy*, 194 Kan. 155, 398 P. 2d 305, and similar cases, that a party's "uncontradicted or unexplained" admissions are binding and conclusive upon him.

In response plaintiff does not quarrel with the *Hiniger v. Judy* rule, but says that no "admission" he made was either "uncontradicted" or "unexplained." He points to such contradictions and explanations in his own testimony: Although he knew there was gas in the basement he had no idea how much there was; he reasoned that if what gas there was hadn't yet exploded it wouldn't do so, particularly after he had shut off the source of escaping gas at the furnace. The hot water heater flame was still isolated by the closed door. He knew propane, unlike natural gas, is heavier than air and collects in low places; opening doors and windows might do but little good in getting it out of the basement. While he was confident that he had found and secured the source of the leak, there was an off chance that there might be a leak in

the line to the furnace; if so, he would be unable to locate it if the main valve were turned off. This explained his failure to shut the gas off at the tank outside. His suggestion to the Dietz family to "Let's get out of here" was not in recognition of any *imminent* danger; it was a simple precaution against *possible* danger, prompted primarily by a desire to get the children out of his way.

In assessing the respective contentions of the parties we are to be guided by our oftstated rule, reiterated in *Autry v. Walls I. G. A. Foodliner, Inc.*, 209 Kan. 424, 497 P. 2d 303:

> "The existence of contributory negligence is a question of fact, it being for the jury to determine from the circumstances of each particular case whether the conduct of a party was such as would be expected of a reasonably prudent person. Only when the plaintiff's conduct can be said as a matter of law to have fallen below the standard of a reasonably prudent person, may the question of contributory negligence be taken from the jury and determined by the court. In ascertaining whether as a matter of law plaintiff is contributorially negligent, precluding recovery, the evidence and all inferences that may reasonably be drawn therefrom must be accepted as true and considered in the light most favorable to the plaintiff. If the facts viewed in that manner be such that reasonable minds might reach different conclusions therefrom, the issue of contributory negligence must go to the jury. (Following *Schenck v. Thompson*, 201 Kan. 608, 443 P. 2d 298.)" (Syl. ¶ 2.)
>
> "Mere knowledge of the danger of doing a certain act without a full appreciation of the risk involved is not sufficient to preclude a plaintiff from recovery, even though there may be added to the knowledge of danger a comprehension of some risk. Moreover, knowledge of the offending instrumentality does not constitute negligence as a matter of law. (Following *Nave v. Hixenbaugh*, 180 Kan. 370 [Syl. ¶ 3], 304 P. 2d 482.)" (Syl. ¶ 3.)

Our task is aided by a consideration of some of our prior gas explosion cases. The most persuasive, perhaps, is *Wainscott v. Carlson Construction Co.*, 179 Kan. 410, 295 P. 2d 649, where the trial court had sustained a demurrer to the petition on the grounds that it revealed plaintiff's contributory negligence as a matter of law by going into his basement to open the windows when he knew that gas had accumulated there. This court reversed, saying:

> "It is not in every instance where one exposes himself to a known danger and injury results that he is denied a right to recover, but only in that class of cases where the danger is so obvious and imminent that a person of ordinary prudence under like circumstances would not subject himself to it. Danger may lurk within every defective condition, and yet may not be of such character that men of ordinary prudence would hesitate to expose themselves thereto. The defect and danger therefrom must be such that knowledge, or imputed knowledge thereof, would cause an ordinarily prudent person to appreciate the risk therefrom. The principle is too well established to require a citation of authorities to support it, that mere knowledge of the danger

of doing a certain act without a full appreciation of the risk involved is not sufficient to preclude a plaintiff from recovery, even though there may be added to the knowledge of danger a comprehension of some risk. Mere knowledge of the offending instrumentality does not constitute contributory negligence as a matter of law. (*Louisville Gas Co. v. Fry*, 147 Ky. 754, 145 S. W. 748; *Loney v. Laramie Auto Co.*, 36 Wyo. 339, 255 Pac. 350, 53 A. L. R. 73, 80.) *It is not contributory negligence, as a matter of law, to enter the basement of a home where gas is perceptibly escaping, or to search for the location of the leak with a light. To do so may not be dangerous, according to the circumstances,* among others, the extent of the leak, the size of the enclosure where located, and the length of time the leak has existed. The question of contributory negligence is a matter for the jury." (*Id.,* 179 Kan. at 413. Emphasis added.)

The fact that *Wainscott* involved a demurrer to the petition does not detract from its force as precedent here; its principles were restated and applied to a demurrer to the evidence in a gas explosion case in *Webster v. Kansas Power & Light Co.*, 182 Kan. 626, 323 P. 2d 643. Whether exposing oneself to escaping gas is contributory negligence still depends on the circumstances.

Our most extreme case is probably *Newland v. City of Winfield,* 131 Kan. 191, 289 Pac. 402. There plaintiff detected the smell of escaping gas and sought for the leak with a lighted match, thereby precipitating an explosion. This court held that his conduct was not contributory negligence per se, but presented an issue for determination by the jury.

Similarly, in *Jelf v. Cottonwood Falls Gas Co.*, 160 Kan. 112, 160 P. 2d 270, plaintiffs smelled gas in their house and had sought the leak with a lighted match without result. The smell of gas was so strong they didn't want to stay in the house with it and opened windows to let it out. Even though they knew the pilot light on their hot water tank was burning, their remaining in the house without shutting off the flame was held not to be contributory negligence as a matter of law, but instead presented an issue for the jury.

In the light of these authorities we cannot say that any of plaintiff's testimony in this case was such an unequivocal admission of unreasonable behavior as to preclude recovery here as a matter of law. As previously noted, there was no real dispute as to what *happened* the day of the explosion, nor as to the facts within plaintiff's knowledge. The issue was whether he had a "full appreciation" of the risk involved, and whether his voluntary exposure to the admitted risk was "unreasonable" under all the circumstances.

Taking the evidence in the light most favorable to plaintiff, and drawing all reasonable inferences in his favor, we think the jury's verdict in his favor was one which reasonable men might have returned. Hence defendant's motion for judgment notwithstanding the verdict was properly overruled.

In summary, we find no error in submitting the case to the jury on the theory of strict liability or in overruling defendant Bryant's motion for judgment n. o. v. The judgment is therefore affirmed.

APPROVED BY THE COURT.

MILLER, J., concurring in part and dissenting in part: I am in complete accord with the court's adoption of the doctrine of strict liability in tort, and with much of the court's opinion. However, I cannot agree with subparagraph (2) of syllabus 10 and corresponding parts of the opinion. In my judgment the trial court should have sustained defendant's motion for judgment *non obstante veredicto*.

The plaintiff has his own business, and for 12 years has installed and repaired gas fired furnaces. He has had some 25 years' experience as a plumber, during which time he worked with gas appliances. He instructs his employees on this subject. It was he to whom Mrs. Dietz turned when she encountered difficulties with her heating plant. Plaintiff should be held to a higher standard of care than that used to measure the conduct of the average man. He was one knowledgeable in the field, with expertise gained through long experience.

We discussed assumption of risk in *Mechtley v. Price,* 217 Kan. 344, 536 P. 2d 1385. At page 348, we said:

". . . Assumption of risk generally bars recovery by [a person] who knows of the danger in a situation but nevertheless voluntarily exposes himself to that danger. In *Kleppe v. Prawl,* 181 Kan. 590, 313 P. 2d 227, 63 ALR 2d 175, we said:

"'. . . [A]ssumption of risk arises through implied contract of assuming the risk of a known danger; the essence of it is venturousness; it implies intentional exposure to a known danger; it embraces a mental state of willingness; it pertains to the preliminary conduct of getting into a dangerous employment or relation; it means voluntarily incurring the risk of an accident, which may not occur, and which the person assuming the risk may be careful to avoid; it defeats recovery because it is a previous abandonment of the right to complain if an accident occurs.' (p. 594.)

"It should be noted the knowledge and appreciation of the risk involved is to be judged by a subjective standard, by knowledge attributable to the individual plaintiff and his situation (Prosser, Law of Torts, 4th ed., 1971, § 68, p. 447).

"Appellant's testimony strongly belies his contention he did not fully apprehend the risks involved in riding an unshod horse. He had a specialized knowledge of riding cattle ponies, extending over a period of years, and their propensity to fall under certain conditions. He had taken care of many horses and their grooming. He specifically acknowledged Oakie did precisely what he knew Oakie was apt to do. . . ."

Prosser, in his Law of Torts, 4th ed. 1971, discusses the standards of conduct in chapter 5. Included in his discussion of "The Reasonable Man" appears the following:

"*Superior Knowledge, Skill and Intelligence*

"Thus far the question has been one of a minimum standard, below which the individual will not be permitted to fall. But if he has in fact knowledge, skill, or even intelligence superior to that of the ordinary man, the law will demand of him conduct consistent with it. . . . [A] physician who is possessed of unusual skill or knowledge must use care which is reasonable in the light of his special ability and information, and may be negligent where an ordinary doctor would not.

"Professional men in general, and those who undertake any work calling for special skill, are required not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability. Most of the decided cases have dealt with physicians and surgeons, but the same is undoubtedly true of . . . skilled trades. . . ." (pp. 161, 162.)

In discussing assumption of risk, Prosser states:

"The defense of assumption of risk is in fact quite narrowly confined and restricted by two requirements: first, that the plaintiff must know and understand the risk he is incurring, and second, that his choice to incur it must be entirely free and voluntary. . . .

" 'Knowledge of risk is the watchword of assumption of risk.' . . . The standard to be applied is, in theory at least, a subjective one, *geared to the particular plaintiff and his situation*, rather than that of the reasonable man of ordinary prudence who appears in contributory negligence. . . ." (Emphasis supplied.) (p. 447.)

We now turn to the facts before us in the light of these rules:

When plaintiff first entered the Dietz basement, he was aware that gas had been leaking for some two hours or longer and that the odor had continued to grow stronger. He recognized the operating hot water heater as a source of imminent danger under the circumstances. He was unable to extinguish the flame from inside the basement without opening a door and increasing the hazard. He caused Mrs. Dietz and her children to vacate the house immediately because of the danger. He knew that there was a shut-off valve on the propane storage tank outside which would stop the flow of gas to the hot water heater and extinguish

its dangerous flame. When plaintiff, with his knowledge and his extensive experience, failed to take this simple step to insure against an explosion before re-entering the basement, he voluntarily, unreasonably and unnecessarily subjected himself to a known danger. His omission precipitated the catastrophe.

However this conduct be categorized—contributory negligence, assumption of risk, or contributory fault—it should bar plaintiff's recovery as a matter of law. I therefore respectfully dissent.

FATZER, C. J., and SCHROEDER, J., join in the foregoing concurring and dissenting opinion.