### No. 24,010.

THE BURGNER-BOWMAN LUMBER COMPANY, *Appellant*, v. THE McCORD-KISTLER MERCANTILE COMPANY, and J. M. LEEPER, *Appellee*.

#### SYLLABUS BY THE COURT.

1. SALE—*"Portland Cement"—Meaning of Term.* The term "Portland cement" is a definition, and as understood in the trade generally means a manufactured article resulting from a certain process; the quantities and various ingredients that compose Portland cement are determined by the requirements fixed by the American Society for Testing Materials.

2. SAME. Portland cement is manufactured by numerous concerns; the name does not mean cement manufactured by the Atlas company, the K. C. company, the Iola company, or any particular concern. It is the name given to a cement which conforms to the requirements of the American Society for Testing Materials. A cement that meets these requirements is Portland cement; one that fails to do so is not Portland cement, regardless of what brand it may be.

3. SALE OF PORTLAND CEMENT—*Implied Warranty—Caveat Emptor Has No Application.* A contractor engaged in the construction of a building ordered from plaintiff, a dealer, Portland cement for the purpose of constructing hard-surfaced concrete floors. He advised plaintiff of the purpose for which the cement was to be used, but did not specify any particular brand of Portland cement, having in mind that plaintiff would furnish him one of a half dozen standard brands among which was K. C. Portland cement. Plaintiff delivered 1,932 sacks of K. C. Portland cement, of which the contractor used 910 sacks. It was of a poor and inferior quality, and so defective that it would not produce a solid, smooth, hard, glazed surface on the floors; the floors checked, cracked and disintegrated, and the contractor returned the unused portion of the cement to the plaintiff. *Held*, that the doctrine of *caveat emptor* has no application and that there was an implied warranty of quality.

4. SAME—*No Contractual Relations With Owner of Building—No Mechanic's Lien.* In the same action to recover for the price of the cement and to establish a mechanic's lien, a cross-petition was filed by the owner of the building, who sought to recover for the damage to the building caused by the defective cement. *Held*, that as there were no contractual relations between the dealer and the owner of the building, the trial court properly denied the owner the right to recover damages.

5. SAME—*Contractor Entitled to No Relief Under the Pleadings.* The contractor filed no cross-petition but answered that in purchasing the materials he was acting as the agent of his codefendant, the owner of the building, who he alleged was entitled to the benefit of a counterclaim by reason of the breach of the contract; for himself he asked for his costs and that the plaintiff take nothing. *Held,* that since he was not asserting any claim for damages himself, the court was correct in awarding him nothing except to release him from all liability to the plaintiff for the price of the defective cement; and *further held,* that under the circumstances he should not be given leave to amend in this court and set up a cross-petition against plaintiff.

Appeal from Lyon district court; WILLIAM C. HARRIS, judge. Opinion filed January 6, 1923. Affirmed.

*Gilbert H. Frith,* of Emporia, for the appellant.

*O. T. Atherton, R. M. Hamer,* both of Emporia, *Robert Stone, George T. McDermott,* and *Robert L. Webb,* all of Topeka, for the appellees.

The opinion of the court was delivered by

PORTER, J.: The plaintiff sued J. M. Leeper, a contractor, to recover for building materials sold him and to foreclose a mechanic's lien on a building belonging to the defendant, The McCord-Kistler Mercantile Company. The defense was that part of the material, consisting of cement, was of inferior quality, and that there was an implied warranty of quality. The trial resulted in a judgment in favor of plaintiff for all the material except for the cement, and from this judgment plaintiff appeals.

The sole question is, whether there was an implied warranty of the quality of the cement. Leeper, the contractor, testified that he ran out of cement, and learning that the plaintiff had two cars on the track, he called up by phone and said he was "up against it"; "that we were putting down finished floors and that the people were in a hurry; that we were late with our building on account of delays, and that if he would accommodate us we would like to have Portland cement to finish floors with." The plaintiff agreed to sell him cement, and it was unloaded out of cars on the job. "That was about the only agreement there was to it; he had the cement and we needed it and we bought it."

Over the plaintiff's objections, Leeper was permitted to testify that the general understanding as to the quality of Portland cement, among the trade in Emporia and that vicinity, was that if

properly mixed and laid it will make a hard, flint-like surface and will meet the tests laid down by the American Society for Testing Materials.

The court found that during the construction of the building the contractor purchased Portland cement from plaintiff for the purpose of making hard-surfaced concrete floors. He advised plaintiff of the purpose for which the cement was to be used. He did not specify any particular brand of Portland cement, but had in mind that plaintiff would furnish one of a half dozen standard brands, among which was "K. C." brand. Plaintiff delivered 1,932 sacks of "K. C." Portland cement, of which the contractor used 910 sacks. It was of a poor and inferior quality and so defective that it would not produce a solid, smooth, hard, glazed surface on the floors, and the floors checked, dusted, cracked and disintegrated, and it will be necessary to remove and reconstruct them; that

"Portland cement, as understood in the trade, means an article resulting from a certain process, which contains certain chemical and physical properties. There is no given or fixed relationship for said ingredients, but they must be in proper proportions. The quantities and various ingredients that compose Portland cement being of varying consistency, are determined by the chemical and physical properties of the finished product, and such properties, as applied to Portland cement, as known in the trade in Emporia and vicinity, and generally are those fixed by the American Society for testing materials.

"The article furnished by the plaintiff to the contractor in this case did not contain the proper chemical and physical properties to perform the purpose for which it was purchased by the contractor and delivered by the plaintiff.

"The cement furnished by plaintiff to the contractor was properly mixed, with the proper proportions of cement, sand and water, as used in said work, and the work was done by experienced and skilled workmen in such construction and in the customary manner for using Portland cement for that purpose, and the work was done in a careful, painstaking, skilled and workmanlike manner, and the sand and water were of good quality for such work."

The plaintiff relies upon the old doctrine of *caveat emptor* and quotes the following statement from 2 Mechem on Sales, § 1349, which was approved in *Ehrsam v. Brown,* 76 Kan. 206, 91 Pac. 179:

"The implied warranty of fitness is not to be extended to cases which lack the necessary conditions upon which it depends. The essence of the rule is that the contract is executory; that the particular article is not designated by the buyer; that only his need is known; that he does not undertake, or is not able to determine what will best supply his need, and therefore necessarily leaves the seller to make the determination and take the risk; and, if these elements are wanting, the rule does not apply." (pp. 217, 218.)

In this connection, attention is called to the fact that the contractor, Leeper, on cross-examination testified that he did not ask plaintiff if Portland cement was fit to finish these floors with; he knew that Portland cement was the proper material and that plaintiff "did not recommend anything. I told him." Further, that if plaintiff had advised him that it was "K. C." cement which plaintiff had he would have taken it just the same; and that he "would as lief" have that brand as any of the others.

On the other hand, the defendants take the position that there would have been no occasion for this lawsuit if the thing delivered had been Portland cement as the term is generally understood.

Among the cases cited by plaintiff is *Ivans v. Laury*, 67 N. J. Law, 153, 50 Atl. 355. There, the defendant called the dealer on the phone and asked, "Have you got Portland cement, Atlas Portland cement?" The dealer answered, "Yes"; the defendant said, "Send me some." Atlas Portland cement was delivered, but of inferior quality. The defense was that the cement did not have the characteristics which Atlas Portland cement should have. The court gave an instruction that the vendor agrees that the article furnished shall correspond with the description of the article asked for; that is, that the vendor shall furnish a cement that will harden rapidly and will have the tensile strength of Atlas Portland cement, which was stated to be of 600 pounds, and when it sets, requires a sledge hammer to break it. There is an implied warranty that the goods shall be of such character. In reversing the case, the supreme court said:

"The cement which was the subject matter of the sale in the present case was purchased by its known designation; that is, as "Atlas Portland cement," and consequently there was no implied warranty of its quality. The judgment below should be reversed."

In the present case, however, the article purchased was Portland cement. No brand was designated by the purchaser as in the case cited, where Atlas Portland cement was purchased, and where it does not appear that the dealer was informed of the particular use for which the cement was purchased. Everyone knows that Portland cement is manufactured by numerous concerns; the name does not mean cement manufactured by the Atlas company, the K. C. company, the Iola company, or any particular concern. It is the name given to a cement which conforms to the requirements of the American Society for Testing Materials. A cement that meets

these requirements is Portland cement; one that fails to do so is not Portland cement, no matter what brand it is.

P. F. Balfour, chief chemist of the company manufacturing the cement, was a witness for the plaintiff and described Portland cement. He gave the following definition:

"Portland cement is the product obtained by finely pulverized clinkers produced by calcining to incipient fusion a properly proportioned mixture of argillaceous materials."

He testified that in the manufacture of Portland cement samples are taken from time to time and put through the tests required by the American Society for Testing Materials. A laboratory is maintained at the plant for the purpose of finding out whether the cement is correct in all respects; it is only by means of a chemical analysis or by the final test of use that it can be determined whether the article is or is not Portland cement. He testified that on the letterheads used in its business his company guaranteed the cement to stand the test as prescribed by this society; that cement sometimes deteriorates after it leaves the factory, due to absorption of moisture or exposure to the elements; that in case of a dispute samples are taken from the car and tested to discover whether the cement is up to the guaranteed standard.

Dr. Roy Cross, a chemist, and a member of the American Society for Testing Materials, was a witness, and said that he made tests of samples of the cement and that it was weak and crumbled very readily in the hands; it did not possess the specific gravity which Portland cement must have, and did not meet the requirements of the American Society for Testing Materials or of the United States government, or of the American Society of Civil Engineers; that its failure might have resulted from long storage.

In *Flour Mills Co. v. Moll,* 106 Kan. 827, 189 Pac. 940, defendant had purchased a car of "Fanchon" flour which was known to be a high-patent hard wheat flour. It was delivered in sacks, branded "Fanchon," but contained a portion of soft wheat flour. In holding that the plaintiff could not recover, it was said in the opinion that the "defendant was no more required to accept the shipment of soft wheat flour than if it had been buckwheat flour or corn meal;" and it was held that there was an implied obligation that the seller would ship and tender "Fanchon" flour; that is, hard wheat flour.

To the same effect is *Kaull v. Blacker,* 107 Kan. 578, 193 Pac. 182, where the defendant purchased a brand of flour called "Gold

Drop," the standard of which was ninety-five per cent patent flour. It would not make bread, and a chemical analysis showed that it was of a poor quality, below standard. In the opinion it was said:

"It must be conceded that when flour is sold, it is sold for use in making bread; there is, therefore, an implied warranty that it will make bread. It follows that if flour sold will not make bread, the purchaser may return it and collect the damages sustained by him." (p. 583.)

Applying the same principles to the present case, it follows that there was an implied warranty as to quality; the article purchased was Portland cement; the thing delivered was not Portland cement, because it did not possess the well-known qualities and characteristics which Portland cement always possesses. Portland cement is a definition and means a standard, not a brand. In this respect it is like the use of the definition "Sterling Silver." The term, Portland cement, is understood in the building trade generally to mean an article which possesses certain qualities. To the contractor in this case it made no difference whether the cement he purchased was made at one town or another. To meet his requirements it had to be Portland cement.

See, also, *Bigger v. Bovard,* 20 Kan. 204; *Tank Co. v. Oil Co.,* 108 Kan. 690, 196 Pac. 1111; *Johnston v. Lanter,* 87 Kan. 32, 123 Pac. 719 (where "No. 1 cypress lath" was purchased, a part of which proved to be not cypress; others made of second growth and defective material and unfit for the purpose for which they were sold).

If this ruling appears to work a hardship upon the dealer, he has recourse against the manufacturer or the person from whom he purchased, provided he insists upon having delivered to him Portland cement. Ordinarily neither the dealer nor the contractor has an opportunity by inspection to discover defects in cement because that requires a laboratory test or a test by use.

There was no error in the court hearing evidence to the effect that it was well understood in the trade at Emporia and generally what is meant by the term "Portland cement." This was not attempting to construe the contract by local usage. The testimony merely went to the proof of a scientific fact known and understood by the building trade generally.

There are two cross appeals. The McCord-Kistler Mercantile Company, owner of the building, contends that the court erred in not allowing it a judgment for damages to the building caused by the defective floors. It seems to be conceded that the floors still

remain in the building. The court awarded judgment in favor of plaintiff against the contractor for $266.85 on account of material furnished other than the cement, and gave plaintiff a lien upon the building for that sum. But the court held that it would be inequitable to permit plaintiff to have a lien upon the building for the defective material which resulted in damage rather than benefit to the mercantile company. The court made a finding that there were no contractual relations between plaintiff and McCord-Kistler Mercantile Company, and for that reason denied the right of the latter to recover for damages to the building. We think the finding as to the fact is sustained by the evidence, and therefore the court was correct in refusing to allow the McCord-Kistler Company a judgment against the plaintiff.

In the other cross appeal Leeper contends that he was entitled to recover damages for delay in completing the building caused by the defective cement. The trouble is that he filed no cross-petition in the court below; he answered with a general denial and the further statement that in purchasing the materials he was acting as the agent of his codefendant, the owner of the building, and that his "codefendant is entitled to all the benefits, privileges, terms and rights arising from said contract." As another conclusion of law, he alleged that as the principal, his codefendant is financially able to respond to any judgment rendered against it, and it "is entitled to the benefit of a counterclaim arising by reason of a breach of said contract." He asked for his costs and that the plaintiff take nothing.

It is insisted, however, that pleadings may be amended to conform to the proof, even in this court (*Nicholson v. Fawley*, ante, p. 124, 210 Pac. 482). That was an action for specific performance of a contract for the sale of real estate which the trial court refused to enforce specifically, but under the circumstances of that case allowed damages to plaintiff covering certain losses incurred in reliance upon the contract. It was held on appeal that the failure to plead the damages was not prejudicial; the pleadings were not considered as amended in this court. In this case the contractor apparently attempted to relinquish to his codefendant whatever supposed right he had to recover damages, although not making a specific assignment of any such claim to his codefendant. His answer was drawn upon the theory that the mercantile company

had a right to recover the entire damages caused by the defective material.

Since he was not asserting any claim for damages himself, the court very properly awarded him nothing except to release him from all liability to plaintiff for the price of the defective cement. He made no application for leave to amend his answer or set up a cross action against plaintiff in the court below, and we are unable to discover any valid reason for allowing him now to assert such a claim.

The judgment is affirmed.

Dawson, J. (dissenting): I fear this decision unsettles an important feature of the law governing sales of commodities by description, where the vendor is merely a dealer and not a manufacturer. (*Ehrsam v. Brown,* 76 Kan. 206, 91 Pac. 179; *Thresher Co. v. Nelson,* 105 Kan. 517, 519, 184 Pac. 982.) I therefore dissent.

---

OPINION ON REHEARING MODIFYING FORMER OPINION.

*Ante,* p. 10, filed July 7, 1923.

SYLLABUS BY THE COURT.

Pleadings—*May Be Treated as Amended Upon Issues Fully Tried Out Upon the Trial.* It is competent for the court to treat pleadings as amended upon an issue which has been fully tried out where it cannot work substantial prejudice to any of the parties to the action, and it is held that the answer of the defendant herein may be treated as amended to ask for a recovery of damages.

The opinion on rehearing was delivered by

Johnston, C. J.: On the motion for a rehearing the court is asked to reconsider the matter of damages with a view of making a final disposition of the case on the record before us. All concede that it is desirable to do so in order to avoid a retrial of the case and adjudge the liability for damages sustained if it can be done under the issues of the case.

On the original hearing it was held that as the contractor purchased the material and there was no contractual relation between the lumber company and the owner of the building, the owner could not recover the damages shown to have been sustained, and that as the contractor had not asked for damages for himself, but had alleged that the owner, his principal, had suffered and was entitled to recover damages, none could be awarded to him. Damages were

sustained because of the character of the cement furnished by the lumber company. The extent of the loss was thoroughly investigated and fully established by the evidence. Upon this evidence, which must have been the same whether damages were asked by the contractor or the owner, the court determined that the amount of the loss was $2,300. It would serve no good purpose to retry the question as to the amount of the damages sustained by reason of the defective cement furnished. The trial court has found that no part of the floors constructed is of any value and that it will be necessary to remove the floors laid and reconstruct them. On that basis, the amount of damages has been determined, and we think upon sufficient evidence. Because the contract provided that Leeper, the contractor, should purchase all the material for the building and had done so, the court held that there was no contractual relation between the lumber company and the owner. By this finding it is clear that the lumber company was liable to the contractor for the ascertained damages.

It was further found that the contractor did his work in a skilled and workmanlike manner and no claim can be made that he was at fault or that there should be a diminution of the damages because of any act or omission of his. Although he did not ask for damages for himself he did allege that damages had been sustained and did ask that they be allowed. He adopted and made the averments of the owner's answer a part of his own and added that his principal, the owner, had sustained damages and was entitled to recover the same by reason of the defective cement furnished.

It is insisted that the pleadings may be amended to conform to the proof and an application of that kind should have been made in the trial court. However, as the case was fully tried out on the issue of damages we think the answer of the contractor may be treated as amended. Neither the lumber company nor the mercantile company can be materially prejudiced by the amendment, and if it had been made in the trial court it is clear that the lumber company's liability must have been the amount found and that under the evidence and findings it should have been adjudged to Leeper.

We conclude, therefore, that the judgment should be modified, awarding the ascertained damages to Leeper who will be responsible for the same to the mercantile company which it is shown has withheld payment of the compensation due Leeper for the construction of the building in an amount in excess of the damages adjudged. The judgment of the trial court when so modified is affirmed.