No. 55,584

PROFESSIONAL LENS PLAN, INC., *Plaintiff/Appellee/Cross-Appellant,* and DR. RONALD E. PRICE and ANN M. PRICE, *Plaintiffs,* v. POLARIS LEASING CORPORATION, *Defendant/Appellee,* v. IMPACT SYSTEMS, a Corporation and OHIO SCIENTIFIC, a Corporation, *Third-Party Defendants,* and OKIDATA CORPORATION, *Third-Party Defendant/Appellant.*

(675 P.2d 887)

Opinion filed January 13, 1984.

*Frederick K. Starrett,* of Ralston & Frieden, of Topeka, argued the cause and was on the brief for appellant.

*John C. Fay,* of Manhattan, argued the cause and was on the briefs for plaintiff-appellee.

*Sam Brownback,* of Stites, Hill & Wilson, of Manhattan, argued the cause and was on the brief for defendant-appellee.

*Dorothy L. Thompson,* of Everett, Seaton, Knopp & Thompson, of Manhattan, argued the cause and was on the brief for third-party defendant Ohio Scientific.

The opinion of the court was delivered by

McFARLAND, J.: This case involves two interlocutory appeals, pursuant to K.S.A. 60-2102(*b*) and Supreme Court Rule 4.01 (230 Kan. lii), concerning the propriety of some of the district court's rulings concerning implied warranty and allowing amendment of pleadings after the alleged expiration of the statute of limitations. The Court of Appeals permitted the appeals to be taken and the case was subsequently transferred to this court for determination.

Plaintiff Professional Lens Plan, Inc., is a corporation wholly owned by plaintiffs Dr. Ronald E. Price and Ann M. Price. Loren H. Shellabarger is the operator of Shellabarger Systems, a company which consults with, and assists businesses in selecting and programming computers. Sometime in 1979, Dr. Price and Mr. Shellabarger entered into an agreement whereby Shellabarger would recommend appropriate computer hardware for Professional Lens Plan, Inc. Five computer systems were presented to Dr. Price and he selected a computer manufactured by Ohio Scientific, a corporation.

Professional Lens Plan, Inc., reached an agreement with Impact Systems for acquisition of an Ohio Scientific computer on or about August 15, 1979. For purposes of tax benefits to the ultimate purchaser and other business considerations, Impact Systems purchased the computer from Ohio Scientific but sold the same to its wholly owned subsidiary, defendant Polaris Leasing Corporation. Polaris then executed an agreement with Professional Lens whereby it would lease the equipment to Professional Lens.

The computer was delivered in September, 1979, to Professional Lens by Impact (the computer having never been in the possession of Polaris). Problems in the operation of the computer commenced shortly after its delivery which were ultimately traced, at least in part, to an allegedly defective hard disc, a

computer component part, which had been purchased by Ohio Scientific from the disc's manufacturer, Okidata Corporation.

On June 12, 1980, plaintiff Professional Lens Plan, Inc., filed this action against defendant Polaris Leasing Corporation alleging the computer was defective and, as a result thereof, plaintiff corporation had suffered lost profits of $43,356.00 and incurred $11,911.31 for such expenses as computer forms, equipment, lease payments made, consultation and programming, insurance, additional office space, additional rent, telephone charges and labor. These figures were amended upward on the pretrial questionnaire filed herein by Professional Lens. On July 15, 1980, defendant Polaris Leasing filed a third-party complaint against Impact Systems and Ohio Scientific for indemnity of any judgment rendered against it in favor of plaintiff Professional Lens. On the same day, Professional Lens filed a motion to join Dr. and Mrs. Price as additional parties plaintiff (this motion was granted on February 26, 1981). Plaintiffs Price are in this litigation as guarantors of the lease (purchaser's) agreement. Third-party defendant Impact Systems, on August 21, 1980, filed a cross-petition against third-party defendant Ohio Scientific for indemnity for any judgment it might have to pay third-party plaintiff, Polaris Leasing. On March 5, 1981, third-party defendant Ohio Scientific filed a third-party petition against Okidata Corporation.

On September 3, 1981, Judge Innes overruled Okidata's motion to dismiss the third-party petition against it holding:

"[B]ased upon *Kennedy v. City of Sawyer*, 228 Kan. 439, 618 P2d 788 (1980) indemnification is inappropriate, but the Motion to Dismiss will not be granted. Instead, *prior to trial, the Court will properly align the parties for purposes of submitting the issue of comparative negligence to the jury.*" (Emphasis supplied.)

Thereafter a snowstorm of summary judgment motions was filed. The case was reassigned to Judge Mershon. On February 28, 1983, Judge Mershon issued his 48-page "Court Journal Entry and Memorandum of Decision on Motion for Reconsideration [of the September 3, 1981, decision] and on All Motions for Summary Judgment." Without attempting to summarize the entire tome, the key holdings for purposes of these interlocutory appeals are as follows:

1. The September 3, 1981, decision was rescinded with the

court concluding the laws of breach of contract, breach of warranty and indemnity, rather than comparative negligence, were to be applied.

2. Plaintiff Professional Lens would be permitted to amend its pleadings by bringing an action directly against Okidata and Ohio Scientific despite the nature of the damages, the lack of privity and the alleged running of the statute of limitations; and

3. Impact's motion for summary judgment against Polaris was sustained on the basis there was no buyer-seller relationship between the two as Polaris was merely the financing agent in the transaction between Impact and Professional Lens.

Interlocutory appeals were duly perfected by Okidata Corporation and Professional Lens. We shall first discuss the issues raised by Okidata.

The first such issue concerns whether the district court erred in finding Professional Lens had a cause of action against Okidata. Stated more specifically, the question is whether Kansas permits a corporate ultimate purchaser, who has incurred only economic loss, as opposed to personal injury or property damage, to recover on theories of breach of implied warranty of fitness and merchantability, from a manufacturer with whom the ultimate purchaser was not in contractual privity.

Privity of contract is defined by Black's Law Dictionary 1362 (4th ed. rev. 1968) as follows:

"**Privity of contract** is that connection or relationship which exists between two or more contracting parties. It is essential to the maintenance of an action on any contract that there should subsist a privity between the plaintiff and defendant in respect of the matter sued on."

In *Booth v. Scheer*, 105 Kan. 643, 185 Pac. 898 (1919), 8 A.L.R. 663, the general common law rule requiring privity in sales contracts was stated as follows:

"Ordinarily there is no privity of contract between the original vendor of personal property and third persons who may purchase or acquire the property from the original vendee; and the original vendor's warranty is a personal obligation between him and his own vendee, and it does not run with the property like covenants concerning real estate." Syl. ¶ 1.

See also *Lumber Co. v. Mercantile Co.*, 114 Kan. 10, 216 Pac. 815, *modified* 114 Kan. 17 (1923), 35 A.L.R. 242.

Problems arose with the strict application of the requirement of privity where manufacturers sold inherently dangerous products to dealers who, in turn, sold them to consumers. An exception to the rule requiring privity was frequently held to exist in situations where a manufactured human foodstuff caused personal injury by virtue of a defect. In *Chandler v. Anchor Serum Co.*, 198 Kan. 571, 426 P.2d 82 (1967), this court was asked to impose an implied warranty, in the absence of contractual privity, for defectively manufactured animal vaccines which resulted in death and disease to plaintiff's cattle. The court, in *Chandler*, analyzed the law of implied warranty as follows:

"Where personal injury or death is caused by unwholesome or contaminated food or drink, we have consistently held that liability may be imposed on the basis of an implied warranty that the food is fit for human consumption. (*Parks v. Pie Co.*, 93 Kan. 334, 144 Pac. 202; *Challis v. Hartloff*, 136 Kan. 823, 18 P.2d 199; *Stanfield v. F. W. Woolworth Co.*, 143 Kan. 117, 53 P.2d 878; *Swengel v. F. & E. Wholesale Grocery Co.*, 147 Kan. 555, 77 P.2d 930; *Sharp v. Pittsburg Coca Cola Bottling Co.*, 180 Kan. 845, 308 P.2d 150; *Simmons v. Wichita Coca-Cola Bottling Co.*, 181 Kan. 35, 309 P.2d 633; *Cernes v. Pittsburg Coca Cola Bottling Co.*, 183 Kan. 758, 332 P.2d 258; *Rupp v. Norton Coca-Cola Bottling Co.*, 187 Kan. 390, 357 P.2d 802; *Connell v. Norton Coca-Cola Bottling Co.*, 187 Kan. 393, 357 P.2d 804.) Likewise, an implied warranty has been extended to include beverage containers (*Nichols v. Nold*, 174 Kan. 613, 258 P.2d 317, 38 A.L.R.2d 887) as well as hair preparations (*Graham v. Bottenfield's, Inc.*, 176 Kan. 68, 269 P.2d 413; *Patterson v. Weyer, Inc.*, 189 Kan. 501, 370 P.2d 116).

"*An implied warranty does not arise from any agreement, as such, between the parties, but is imposed by operation of law on the basis of public policy for the protection of the people. (Connell v. Norton Coca-Cola Bottling Co., supra; Cernes v. Pittsburg Coca Cola Bottling Co., supra; Graham v. Bottenfield's, Inc., supra.) Thus privity of contract is not essential to recovery against the manufacturer and each intermediate dealer, as well as the retailer. (Rupp v. Norton Coca-Cola Bottling Co.*, supra, and cases therein cited.) The rule is well stated in *Swengel v. F. & E. Wholesale Grocery Co.*, supra, as follows:

" 'Where articles of food for human consumption are manufactured or packed by a manufacturer or packer, and by a series of transactions reach a retail dealer who sells to the consumer, the manufacturer or packer, each intermediate dealer and the retail seller impliedly warrant that such articles of food are wholesome and fit for immediate human consumption.' (Syl. ¶ 2.)

"In *B. F. Goodrich Company v. Hammond*, 269 F.2d 501 (10th Cir. 1959), a husband and wife were killed in an automobile accident resulting from the blowout of a tire purchased by the husband from the defendant company. Applying Kansas law, the court found there was an implied warranty of fitness of an automobile tire for the purpose for which it was designed, *i.e.*, as a tire protected against sudden blowouts, citing *Rig & Reel Co. v. Oil & Gas Co.*, 111 Kan. 37, 205 Pac. 1020, and held that since implied warranty in this state was imposed by operation of law, privity was not essential, and the warranty ran to

the wife of the purchaser of the tire. The case was cited with approval in *Rupp v. Norton Coca-Cola Bottling Co.*, supra, which held an implied warranty imposed by law extended to the sister of the purchaser, notwithstanding the lack of privity of contract. We have likewise held that in an action to recover on a breach of implied warranty, neither the contributory negligence of the user nor evidence negativing the lack of due care on the part of the manufacturer, distributor or retailer constitutes a defense. (*Challis v. Hartloff*, supra; *Simmons v. Wichita Coca-Cola Bottling Co.*, supra.)

"Courts in other jurisdictions in which recovery has been sought against the manufacturer and seller of animal foods and medicines for breach of an implied warranty of fitness vary widely in their holdings and reasonings (see Anno. 81 A.L.R. 2d 138, §§ 11, 12; 3 Hursh, American Law of.Products Liability, ch. xxi). We note, however, that there has been a continuous eroding of the doctrine of *caveat emptor* in the area under consideration." 198 Kan. at 579-80. (Emphasis supplied.)

The court then reviewed animal food and medicine cases from other jurisdictions and held:

"*[T]he same public policy consideration necessary for the protection of human beings involving the manufacture and sale of food and drink for human consumption is likewise present in cases dealing with animal foods and medicines.* Domestic animals constitute the backbone of farm economy in many of the agricultural areas of this country. In our system of enterprise where the potential purchaser is subjected to the advertising pressures of manufacturers, distributors and retailers in promoting the sale of a product, it is of necessity that the purchaser be provided a measure of assurance that the product is fit for the ordinary purposes for which it is sold. Medicines and vaccines for the treatment of domestic animals are manufactured and sold for the purpose and with the expectation they will be used as such, and public policy dictates that if such articles are unfit for the use contemplated by all parties in the chain of sale, then the purchaser must be protected. *Accordingly, we are of the opinion there is no compelling reason in our modern-day system of merchandising to refuse to extend an implied warranty of fitness to include animal vaccines.*

"*Further, we hold that the implied warranty of fitness runs not only from the manufacturer who created the defective product, but also from the distributor-wholesaler and the retailer as well.*" 198 Kan. at 582. (Emphasis supplied.)

*Evangelist v. Bellern Research Corporation*, 199 Kan. 638, 433 P.2d 380 (1967), involved a personal injury action wherein an attempt was made to extend implied warranty to a recapping device for soda pop, known as "Handy Dandy," to its manufacturer who was not in contractual privity with the plaintiff-consumer. The court reasoned:

"We now turn our attention to the liability of Bellern, the manufacturer of the 'Handy Dandy.' Plaintiff sought recovery against said defendant on the theory of breach of implied warranty in that the recapping device was defectively manufactured and designed. The record is barren of evidence showing the instru-

ment was defectively manufactured, so we need only concern ourselves with defective design. It is not entirely clear on what basis the trial court sustained the motion for directed verdict on behalf of Bellern. Irrespective of that fact, we think the propriety of the ruling should be considered from the standpoint of whether or not as a matter of law plaintiff may predicate liability against the defendant for breach of an implied warranty of manufacturer-design.

"Plaintiff has cited us to no authority holding that there is an implied warranty against defective design on the part of a manufacturer of a simple household device such as the 'Handy Dandy,' and our limited research has revealed none. We gather from plaintiff's brief and argument he is asking us to recognize and apply an implied warranty to this device upon the same public policy considerations that were used in cases involving food, drink, beverage containers, hair preparations, and recently, animal vaccine. Conversely, defendant suggests that were we to extend an implied warranty against defective design to a product of this type, and thus further carve out an exception to the common-law rule of *caveat emptor,* it would virtually amount to the wholesale lifting of the privity requirement in this state on all products.

"The status of our law on implied warranty was thoroughly explored in *Chandler v. Anchor Serum Co.,* 198 Kan. 571, 426 P.2d 82, and the reader is directed to that opinion for a review of our decisions. *The cases therein cited and discussed illustrate that where an implied warranty was found, it was imposed by operation of law on the basis of public policy, and consequently, privity of contract was not essential for recovery against the manufacturer. These exceptions to the common-law rule have been born on a case-by-case basis as the need for protection to the consuming public demanded, and with each exception the privity requirement has fallen.*

"*The nature of the product involved in each case has been, as it should be, of manifest importance in determining whether or not warranty protection should be extended as a matter of public policy.* The lack of similarity of the 'Handy Dandy' and the products involved in those cases reviewed in *Chandler* is readily apparent. The product here is quite unlike an automobile tire which, from its very nature, could be imminently dangerous to life and limb if defectively designed. (See *B. F. Goodrich Company v. Hammond,* 269 F.2d 501 [10th Cir. 1959].) We have here a product likely found in many households. Its only feature possessing any uniqueness is that it may be used to manually recap a beverage bottle. It is free from working parts, and simple in design. Inherently dangerous characteristics are lacking, and common sense dictates its limitations of use. That the device may become imminently dangerous if defectively designed, and thus bring about injury, is difficult to imagine, and at best, is a remote possibility. The same may be said of many common tools, such as a hammer, kitchen knife, or ice pick. The law, however, does not require that every product be accident-proof or totally incapable of doing harm. It would be unreasonable, in our opinion, to hold the manufacturer of this simple household device responsible for every injury which might ensue from mishap in its use on the ground that it could have been designed safer or completely accident-free." 199 Kan. at 647-48. (Emphasis supplied.)

The court then held as a matter of law plaintiff could not recover from defendant manufacturer on a theory of implied warranty.

The incidents giving rise to the litigation in both *Chandler v. Anchor Serum Co.*, 198 Kan. 571, and *Evangelist v. Bellern Research Corporation*, 199 Kan. 638, occurred before this state's adoption of the Uniform Commercial Code (K.S.A. 84-1-101 *et seq.*) effective in 1966.

K.S.A. 84-2-318 sets limits on persons who may assert breach of implied warranty actions under 84-2-314 (merchantability) and 84-2-315 (fitness for a particular purpose). K.S.A. 84-2-318 provides:

"A seller's warranty whether express or implied extends to any *natural* person who may reasonably be expected to use, consume or be affected by the goods and who is *injured in person* by breach of the warranty. A seller may not exclude or limit the operation of this section." (Emphasis supplied.)

K.S.A. 84-2-318 is Alternative B of U.C.C. 2-318 (there are two other alternatives, A and C). Alternative B has been adopted by nine states and the Virgin Islands, some jurisdictions making a few modifications. White & Summers, Uniform Commercial Code § 11-3, p. 404, n. 18 (2d ed. 1980); 3 Anderson, Uniform Commercial Code § 2-318:3 (3rd ed. 1983).

Alternative B (84-2-318) extends express or implied warranties to natural persons who may reasonably be expected to use the goods and who are injured in person. Alternative A, by comparison, is more restrictive, stating:

"A seller's warranty whether express or implied extends to any *natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person* by breach of the warranty. A seller may not exclude or limit the operation of this section." (Emphasis supplied.)

Alternative C broadens the scope of those who may seek recovery on warranty by stating:

"A seller's warranty whether express or implied *extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty*. A seller may not exclude or limit the operation of this section with respect to injury to the person of an individual to whom the warranty extends." (Emphasis supplied.)

As noted in the Official UCC Comment 2 following 84-2-318:

"The purpose of this section is to give certain beneficiaries the benefit of the same warranty which the buyer received in the contract of sale, thereby freeing any such beneficiaries from any technical rules as to 'privity.' It seeks to

accomplish this purpose without any derogation of any right or remedy resting on negligence. It rests primarily upon the merchant-seller's warranty under this Article that the goods sold are merchantable and fit for the ordinary purposes for which such goods are used rather than the warranty of fitness for a particular purpose. Implicit in the section is that any beneficiary of a warranty may bring a direct action for breach of warranty against the seller whose warranty extends to him."

Professional Lens is the buyer of the computer and hence any question of extending the buyer's warranty to others (the whole purpose of 84-2-318) does not arise in regard to Professional Lens. Additionally, if same did apply in principle, Professional Lens is not a "natural person" who was personally injured. Determination of the issue before us is not a matter of statutory construction.

K.S.A. 84-2-318 has been characterized as relating wholly to "horizontal privity," that is, extending the class of plaintiff beyond that of the actual purchaser. The question of whether a plaintiff can extend the class of defendants beyond that of the seller is sometimes characterized as a matter of "vertical privity." See Rasor, Kansas Law of Sales Under the Uniform Commercial Code § 9-6 (1981). These terms are technically misnomers as imposition of implied warranties between persons who are in the buyer-seller relationship is an exception to the requirement of privity.

The propriety of allowing a non-privity ultimate purchaser who has suffered only direct or consequential economic loss to recover from a remote manufacturer of an allegedly defective product under an implied warranty theory has been a matter of considerable debate within the legal profession. See for example Rasor, *The History of Warranties of Quality in the Sale of Goods: Contract or Tort?—A Case Study in Full Circles*, 21 Washburn L.J. 175 (1982); Zammit, *Manufacturers' Responsibility for Economic Loss Damages in Products Liability Cases: What Result in New York?* 20 N.Y.L.F. 81 (1974); Comment, *The Demise of Vertical Privity: Economic Loss Under the Uniform Commercial Code*, 2 Hofstra L. Rev. 749 (1974); Speidel, *Products Liability, Economic Loss and the UCC*, 40 Tenn. L. Rev. 309 (1973); Comment, *The Vexing Problem of the Purely Economic Loss in Products Liability: An Injury in Search of a Remedy*, 4 Seton Hall L. Rev. 145 (1972); Comment, *Implied Warranties and "Economic Loss"*, 24 Baylor L. Rev. 370 (1972);

Comment, *Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages—Tort or Contract?* 114 U. Pa. L. Rev. 539 (1966), Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum. L. Rev. 917 (1966). See generally White, *Contract Law in Modern Commercial Transactions, An Artifact of Twentieth Century Business Life?* 22 Washburn L. J. 1 (1982); and Murray, *The Article 2 Prism: The Underlying Philosophy of Article 2 of the Uniform Commercial Code*, 21 Washburn L. J. 1 (1981). See also Annot., Privity of Contract as Essential in Action Against Remote Manufacturer or Distributor for Defects in Goods Not Causing Injury to Person or to Other Property, 16 A.L.R.3d 683; Annot., Third-Party Beneficiaries of Warranties Under UCC § 2-318, 100 A.L.R.3d 743.

White & Summers, Uniform Commercial Code (2d ed. 1980), has squarely addressed the issue of direct and consequential economic loss damages of a non-privity ultimate purchaser in implied warranty actions. Speaking of direct economic loss, Messrs. White and Summers have said:

"[T]he law permits a non-privity buyer to recover for direct economic loss if the remote seller has breached an *express* warranty. Where the buyer cannot show reliance on express representations by the remote seller, however, the case law is in conflict. *The majority of courts still appear to hold that absent such reliance, a non-privity buyer, whether commercial or consumer, cannot recover for direct economic loss on either an express or an implied warranty theory.* We have found only two commercial cases to the contrary.

"A minority of courts, however, permit 'warranty' recovery for direct economic loss by non-privity buyers who are ordinary *consumers*." § 11-5, pp. 407-08. (Emphasis supplied.)

Of consequential economic loss White and Summers have stated:

"*Consequential* economic loss includes loss of profits, loss of good will or business reputation and other loss proximately resulting from a defective product beyond direct economic loss as defined in the preceding section (loss of bargain, cost of repair, replacement cost, and the like). Recall that the Code neither authorizes nor bars recovery by a non-privity purchaser for economic loss— whether consequential or direct. *The vast majority of courts do not allow non-privity consumer purchasers to recover for consequential economic loss.* Even courts that allow non-privity consumer purchasers to recover for direct economic loss do not permit such purchasers to recover for consequential economic loss. Note that *consumer* buyers ordinarily do not suffer any consequential economic loss and only seek recovery for direct economic losses such as loss of bargain or costs of repair.

"We concur in this majority view." § 11-6, p. 409. (Emphasis supplied.)

In *State ex rel Western Seed v. Campbell*, 250 Or. 262, 442 P.2d 215 (1968), *cert. denied* 393 U.S. 1093 (1969), the Oregon Supreme Court commented:

"A buyer whose seller proves to be irresponsible will understandably seek relief further afield. But to allow a nonprivity warranty action to vindicate every disappointed consumer would unduly complicate the code's scheme, which recognizes the consensual elements of commerce. Disclaimers and limitations of certain warranties and remedies are matters for bargaining. Strict-liability actions between buyers and remote sellers could lend themselves to the proliferation of unprovable claims by disappointed bargain hunters, with little discernible social benefit. Because the buyer and his seller will normally have engaged in at least one direct transaction, litigation between these parties should ordinarily be simpler and less costly than litigation between buyer and remote seller. For these reasons we retain the rule stated in *Price v. Gatlin*, [241 Or. 315, 405 P.2d 502 (1965)]: Where the purchaser of an unmerchantable product suffers only loss of profits, his remedy for the breach of warranty is against his immediate seller unless he can predicate liability upon some fault on the part of a remote seller." 250 Or. at 267-68.

## White & Summers has observed:

"Even if relevant policies justify allowing non-privity consumers to recover for direct economic loss, there can be no justification in the usual case for allowing non-privity consumer buyers to recover for consequential economic losses they sustain. Remote buyers may use a seller's goods for unknown purposes from which enormous losses might ensue. Since the remote seller cannot predict the purposes for which the goods will be used he faces unknown liability and may not be able to insure himself. Insurers are hesitant to insure against risks they cannot measure. Moreover, here more than in personal injury and property damage cases, it is appropriate to recognize the traditional rights of parties to make their own contract. If a remote seller wishes to sell at a lower price and exclude liability for consequential economic loss to sub-purchasers, why should we deny him that right? Why should we design a system that forces him to bear the unforeseeable consequential economic losses of remote purchasers? Indeed, by forcing the buyer to bear such losses we may save costly law suits and even some economic losses against which buyers, knowing they have the responsibility, may protect themselves. In short, we believe that *a buyer should pick his seller with care and recover any economic loss from that seller and not from parties remote from the transaction.*" § 11-6, pp. 409-10. (Emphasis supplied.)

The economic loss claimed by Professional Lens appears to be consequential rather than direct under the following White & Summers, Uniform Commercial Code (2d ed. 1980) definition:

"Direct economic loss . . . includes ordinary loss of bargain damages: the difference between the actual value of the goods accepted and the value they would have had if they had been as warranted. Courts will also frequently measure direct economic loss by the purchaser's cost of replacement or cost of repair. 'Consequential economic loss,' on the other hand, encompasses all eco-

nomic harm a purchaser suffers beyond direct economic loss as defined above. Thus, consequential economic loss includes loss of profits resulting from failure of the goods to function as warranted, loss of goodwill and loss of business reputation." § 11-5, p. 406.

However for purposes of this issue we need only utilize the general term, economic loss, as we see no valid reason for distinguishing between direct and consequential economic loss in the circumstances herein.

In *Owens-Corning Fiberglas v. Sonic Dev. Corp.*, 546 F. Supp. 533 (D. Kan. 1982), Judge Saffels was called upon to decide whether Kansas law permitted a corporate buyer to maintain an action against a non-privity manufacturer for only economic loss based on breach of implied warranties of fitness and merchantability. In holding such action was not proper, Judge Saffels reasoned:

"*The issue is whether or not privity of contract is a requirement in Kansas for a claim based on breach of implied warranty. We hold that because plaintiff did not buy the air compressors directly from Quincy, but instead bought them from Sonic, an intermediary in the chain of distribution, there is no privity between plaintiff and Quincy, and thus no cause of action against Quincy for breach of an implied warranty.*

"*K.S.A. 84-2-318 provides that lack of privity is not a bar to recovery by a natural person who is personally injured by a breach of warranty. Plaintiff is, of course, not a natural person and did not suffer personal injury because of the breach of warranty. Therefore, lack of privity of contract bars this lawsuit. Citizens State Bank v. Martin*, 227 Kan. 580, 589-90, 609 P.2d 670 (1980).

"Breach of warranty actions, like all breach of contract actions, must be brought by parties who are in privity of contract. *Evangelist v. Bellern Research Corp.*, 199 Kan. 638, 647, 433 P.2d 380 (1967). As an exception to the privity requirement, no privity is required where personal injury is involved. *B. F. Goodrich Co. v. Hammond*, 269 F.2d 501 (10th Cir. 1959). Privity is also not required in personal injury cases involving implied warranties that food is fit for human consumption, unwholesome drink containers, and health preparations intended for human use. *See, e.g., Chandler v. Anchor Serum Co.*, 198 Kan. 571, 579-80, 426 P.2d 82 (1967), for cited cases. K.S.A. 84-2-318 was not intended to alter these common-law rules. *See also* Kansas Code Comment to K.S.A. 84-2-318.

"Furthermore, the Kansas Legislature has rejected a draft version of § 2-318 [Alternative C] which would have extended implied warranties to all foreseeable product users, even if no personal injury was involved. For these reasons, we hold plaintiff cannot maintain his action for breach of implied warranty of fitness for purpose.

"Our preceding remarks apply equally to plaintiff's claims against Quincy for breach of implied warranty of merchantability. *Absent privity, plaintiff cannot maintain a cause of action for breach of this implied warranty against Quincy.*" 546 F. Supp. at 541. (Emphasis supplied.)

In *Hole v. General Motors Corp.*, 83 App. Div. 2d 715, 442 N.Y.S.2d 638 (1981), the New York court reached a similar result in interpreting that state's version of Alternative B of U.C.C. § 2-318 (N.Y. U.C.C. § 2-318 [McKinney, 1983 Supp.]), the alternative enacted in Kansas (84-2-318). In *Hole*, the New York court declared:

"Our interpretation of the above statute [U.C.C. § 2-318] leads us to conclude that it does not permit a plaintiff, not in privity, to recover upon the breach of an implied warranty of merchantability unless the claim of the remote user is for personal injuries. In *Potsdam Welding & Mach. Co. v. Neptune Microfloc* (57 AD2d 993 [, 394 N.Y.S.2d 744 (1977)]), without specifically deciding whether section 2-318 of the Uniform Commercial Code or its amended version (L 1975, ch 774, § 1) applied, we held that a cause of action based on the breach of an implied warranty does not exist when there is no seller-buyer relationship or sales contract between the parties and the plaintiff is not 'injured in person' (see *Mendelson v. General Motors Corp.*, 105 Misc 2d 346 [, 432 N.Y.S.2d 132 (1980), aff'd 81 App. Div. 2d 831 (1981)]; *Maure v. Fordham Motor Sales*, 98 Misc 2d 979 [, 414 N.Y.S.2d 882 (1979)]). The statute is clear and affords relief to one 'who is injured in person'. *To extend the seller's implied warranty to remote parties not in privity so as to permit recovery for economic loss would impair traditional rights of parties to make their own contract and discard the principle that a buyer should pick his seller with care and recover any economic loss from that seller. While the citadel of privity has been shaken (Randy Knitwear v. American Cyanamid Co.*, 11 NY2d 5 [, 226 N.Y.S.2d 363, 181 N.E.2d 399 (1962)]), *it has not been altogether razed* . . . ." 83 App. Div. 2d at 716. (Emphasis supplied.)

Public policy reasons are the basis on which implied warranties have been extended to non-privity manufacturers whose inherently dangerous products cause physical injuries to buyers. However, imposing implied warranties on non-privity manufacturers for a buyer's economic loss is a major step, not to be taken lightly. If contractual privity is not necessary to maintain an action for breach of an implied warranty of fitness (84-2-315), how is it possible for a remote seller to have reason to know any particular purpose for which its goods are required by an unknown ultimate buyer? What is the time of contracting under 84-2-315 between a remote manufacturer and an ultimate purchaser? How does a buyer rely upon the skill or judgment of a seller it has never met or had any dealing with and maybe doesn't even know the existence of? The problems do not end with 84-2-315, they only begin. For example, how is a remote manufacturer to afford itself of the ability to exclude or modify warranties under 84-2-316, when the remote manufacturer does not know to whom it must exclude or modify its warranties? In

turn, how is an ultimate purchaser, pursuant to 84-2-607(3)(*a*), to give notice of defect to a remote manufacturer whom it does not know? Further, how is 84-2-719 authorizing contractual modification or limitation of remedy to operate between parties who have not dealt directly with each other? Specifically, how is a remote manufacturer to avail itself of 84-2-719(3) which permits limitation or exclusion of consequential damage liability? An across-the-board extension of implied warranties to non-privity manufacturers or sellers, without regard to the nature of either the involved product or the type of damage sought, would spawn numerous problems in the operation of Article 2 of the Uniform Commercial Code. See generally Murray, *The Article 2 Prism: The Underlying Philosophy of Article 2 of the Uniform Commercial Code,* 21 Washburn L.J. 1 (1981).

The computer and its component part, the hard disc, are clearly not products which are inherently dangerous. Here damages are sought only for economic loss, no personal injuries or property damage being involved. We find no public policy dictates extending implied warranties of fitness and merchantability to the non-privity manufacturers herein.

We conclude implied warranties of fitness and merchantability are not extended to a remote seller or manufacturer of an allegedly defective product, which is not inherently dangerous, for only economic loss suffered by a buyer who is not in contractual privity with the remote seller or manufacturer. Accordingly the district court erred in holding that Professional Lens had a cause of action against Okidata Corporation for economic loss based on breach of implied warranty.

The second issue may be stated as follows: In the event this court concludes Professional Lens has a cause of action against Okidata based on breach of implied warranties, are warranty and damage limitations contained in Okidata's sale of the hard disc to Ohio Scientific binding upon Professional Lens, the ultimate purchaser? Such issue, then, relates to certain defenses Okidata might utilize in defending against Professional Lens' action against Okidata. We have concluded in the foregoing issue that Professional Lens has no cause of action against Okidata. Therefore, this issue is moot.

The third issue is whether the district court erred in permitting Professional Lens to amend its pleadings after the expiration of

the applicable statute of limitations and bring an action directly against third-party defendants Okidata Corporation and Ohio Scientific for breach of implied warranties.

The basic issue is whether the applicable statute of limitations is three years (K.S.A. 60-512) or four years (K.S.A. 84-2-725). If the applicable statute is four years, then it is conceded the amendments were timely. If three years is the proper statute of limitations, then the amendments came after the expiration of the statute of limitations, and consideration is sought of complex arguments relative to the relation back of amendments and a form of estoppel arising from the district court's ruling of September 3, 1981 (later rescinded).

Here again, this court's previous determination Professional Lens has no cause of action against Okidata renders this issue as it relates to Okidata moot. However, it would be inappropriate to move to the next issue without reference to the procedural problems that exist in this case. Only Okidata sought an interlocutory appeal on the first three issues raised in this case and the district court granted the right to Okidata alone to take this appeal on these issues. Ohio Scientific is an *appellee* herein and is not an opposing party to any position of appellant Okidata in this appeal. Notwithstanding these facts, Ohio Scientific wears the same shoes as does Okidata as to issues number one (implied warranty) and three (statute of limitations). Ohio Scientific has filed a brief herein which essentially is a "me too" to Okidata's brief. Despite the procedural problems in the way the matter comes before us, we conclude judicial economy and the best interests of the litigants would be better served by simply declaring the lack of privity between Professional Lens and Ohio Scientific defeats Professional Lens' claims against Ohio Scientific for breach of implied warranties on the rationale set forth in issue number one herein. Therefore, the statute of limitations issue is also moot as to Ohio Scientific.

This concludes the discussion of all issues raised by Okidata in its interlocutory appeal.

The final issue is the only issue raised by Professional Lens Plan, Inc., in its interlocutory appeal and is stated as follows: In light of the trial court's ruling sustaining Impact Systems' motion for summary judgment against Polaris Leasing in this case, does privity of contract exist between plaintiff and Impact Systems?

Interlocutory appeals are governed by K.S.A. 60-2102(*b*) as follows:

"When a *district judge* or associate district judge, in *making* in a civil action *an order* not otherwise appealable under this section, *shall be of the opinion* that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and *that an immediate appeal from the order may materially advance the ultimate termination of the litigation,* said judge shall so state in writing in such order. The court of appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten (10) days after the entry of the order under such terms and conditions as the supreme court may fix by rule. Application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or associate district judge or an appellate court or a judge thereof shall so order. (Emphasis supplied.)

See Supreme Court Rule 4.01 (230 Kan. lii) which sets forth the procedure to be followed.

As will be recalled, Polaris Leasing brought Impact Systems into this litigation as a third-party defendant. Impact Systems was granted summary judgment on the third-party petition on the basis Polaris Leasing was not, in fact, the purchaser of the computer from Impact Systems but was only the financing agent. Hence the court reasoned there could be no implied warranties between Impact Systems and Polaris Leasing. In this interlocutory appeal *no one is challenging the propriety of this determination.* Rather, Professional Lens, who was not a party to the summary judgment, is asking this court to extend the district court's rationale and find, as a matter of law, Professional Lens and Impact Systems are in a buyer-seller relationship and hence there is privity between them. This is a matter which was not determined by the district court.

We conclude this issue is not the proper subject of an interlocutory appeal and, accordingly, we have no jurisdiction to determine it. The interlocutory appeal of Professional Lens must be dismissed.

In the interlocutory appeal of Okidata Corporation, the order permitting Professional Lens Plan, Inc., to bring a breach of implied warranty action against Okidata Corporation and Ohio Scientific is vacated. The interlocutory appeal of Professional Lens Plan, Inc., is dismissed.